UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

VS.                              CASE NO: 2:15-cr-74-FtM-29CM

FREDDIE KING
_____

## OPINION AND ORDER

This matter comes before the Court on defendant's Motion to Suppress (Doc. #43) filed on November 25, 2015. Defendant seeks suppression of items seized from his apartment on May 4, 2015, based upon alleged violations of his Fourth Amendment rights. The United States' Response (Doc. #44) was filed on December 9, 2015. The undersigned conducted an evidentiary hearing on February 16, 2016, and heard testimony from Deputy Roberto Torres, Deputy Jorge Oro, Detective Marsha Sutphin, Detective Ashley Thorpe, and defendant Freddie King. The Court also admitted Government's Exhibits 1 through 6. The Court makes the findings of fact and conclusions of law set forth below.

### I.

The Fourth Amendment provides in pertinent part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. The Court starts with

the proposition that a person's home occupies a special place for constitutional protection. <u>Florida v. Jardines</u>, 133 S. Ct. 1409, 1414 (2013)("But when it comes to the Fourth Amendment, the home is first among equals."); <u>Payton v. New York</u>, 445 U.S. 573, 585-86 (1980)("physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed" (citation omitted)); <u>Bashir v. Rockdale County</u>, 445 F.3d 1323, 1327-28 (11th Cir. 2006)("The sanctity of the home is afforded special protection under the Fourth Amendment . . . ."); <u>United States v. McGough</u>, 412 F.3d 1232, 1236 (11th Cir. 2005)("Of all the places that can be searched by the police, one's home is the most sacrosanct, and receives the greatest Fourth Amendment protection.")

While a home's threshold has special constitutional protection, law enforcement officers may approach it in the same manner as any other person. <u>Jardines</u> recognized that a visitor is typically permitted "to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." 133 S. Ct. at 1415. "Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" <u>Id.</u> at 1416 (quoting <u>Kentucky v. King</u>, 563 U.S. 452, 469 (2011)). <u>See also</u> <u>United States v. Tobin</u>, 923 F.2d 1506, 1511 (11th Cir. 1991) (no search warrant necessary for officers

to approach house to question the occupants); United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir. 2006)("knock and talk" by officers in response to 911 hang-up call does not violate Fourth Amendment.)

Entry into the home without a warrant, however, is presumptively unreasonable, and therefore a violation of the Fourth Amendment. King, 563 U.S. at 459; Payton, 445 U.S. at 586. An arrest warrant for an individual allows officers to enter that person's home if it was reasonable to believe the person was there. Payton, 445 U.S. at 603. An arrest warrant is not sufficient, however, to allow the officers to enter the home of a third party without a search warrant. Steagald v. United States, 451 U.S. 204 (1981).

The presumption of unreasonableness may be overcome if there is a valid consent for such entry. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). The burden of proving an exception to the warrant requirement rests with the government. United States v. McGough, 412 F.3d 1232, 1237 n.4 (11th Cir. 2005). In this context, the government must prove facts which establish a valid consent to search by at least a preponderance of the evidence. United States v. Matlock, 415 U.S. 164, 177 (1974). "The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and '[v]oluntariness is a question of fact to be determined from all the circumstances.'" Ohio v. Robinette, 519

U.S. 33, 40 (1996) (quoting Schneckloth, 412 U.S. at 248-49)).  A consensual search is constitutional if it is the product of an "essentially free and unconstrained choice." Schneckloth, 412 U.S. at 225.  Schneckloth set forth a number of factors for a court to consider: the person's youth, his lack of education, evidence of the person's low intelligence, the existence of advice as to the nature of the constitutional right implicated, the length of detention preceding the request to consent, the nature of prior questioning, the environment, and whether any physical punishment was involved. Id. at 226.

The government's burden of proving the voluntariness of consent is not satisfied by "showing a mere submission to a claim of lawful authority" which overcame his consent.  Florida v. Royer, 460 U.S. 491, 497 (1983).  Compare United States v. Ramirez-Chilel, 289 F.3d 744, 750-52 (11th Cir. 2002)(valid consent where defendant opened door and yielded the way for officers, where no guns were drawn and there was not a large number of officers), with United States v. Edmondson, 791 F.2d 1512, 1514-15 (11th Cir. 1986)(consent invalid where FBI agents surrounded apartment, drew weapons, knocked on the door yelling "FBI. Open the door," and defendant opened the door, stepped back, and placed his hands upon his head).

In this case there is conflicting testimony, so credibility is a major issue.  A defendant's testimony alone, if believed,

can carry the day.  See Gallego v. United States, 174 F.3d 1196, 1198-99 (11th Cir. 1999).  District courts are required to conduct a proper credibility determination, which includes taking into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their candor and demeanor on the stand. Ramirez-Chilel, 289 F.3d at 749-50.  Law enforcement officers are not automatically credited with truthfulness simply because of their occupation.  Id.  While a fact finder may consider a witness's criminal history, the existence of felony convictions does not necessarily render testimony not credible.  United States v. Calderon, 127 F.3d 1314, 1324-25 (11th Cir. 1997)(rejecting an attack on the credibility of witnesses who were convicted felons cooperating with the government).  As the Court routinely instructs juries, a finder of fact may accept or reject any portion of a witness's testimony, in whole or in part.  Eleventh Circuit Pattern Jury Instructions (Criminal Cases) Basic Instruction 5 (2010).

## II.

### A. Officers' Approach to Defendant's Apartment

Here, officers of the Lee County Sheriff's Office possessed an arrest warrant for Danielle Blawat for misdemeanor violation of probation.  The officers had been looking for her for several days, and received information from a citizen that she was temporarily staying at 2055 Braman Ave, Apt. 12, Fort Myers,

Florida.  Deputy Torres, Deputy Oro, and Detective Sutphin went to that address to look for Ms. Blawat.  All three officers were in uniform, but none drew their firearms.  Apartment 12 was on the second floor, accessible by an exterior set of stairs.  The officers climbed the stairs and walked along the exterior corridor of the building until they reached a door which was marked "12." Officer Torres then knocked on the door.  Deputy Oro, who was being trained by Deputy Torres, stood behind him, while Detective Sutphin stood against an exterior wall out of view of the occupant of the apartment unit.  The officers were allowed to approach the threshold of the apartment and knock on the door.  So far, there has been no violation of any constitutional provision.

**B. Entry Into Defendant's Apartment**

The door to Apartment 12 was opened by Freddie King, a person who was not known to the officers.  It is undisputed that the deputies did not have a search warrant prior to entering Mr. King's home, and the government does not assert that the arrest warrant for Ms. Blawat authorized entry into the apartment. Therefore the entry is presumptively unreasonable unless the government proves by at least a preponderance of the evidence that Mr. King gave valid consent.  The testimony on this point is conflicting.

### (1)  Officers' Version

Deputy Torres was the officer who knocked on the door and, along with Deputy Oro, spoke with Mr. King.  Officer Torres identified himself, explained why they were there, and asked if Mr. King knew Danielle Blawat.  When Mr. King said he did, Officer Torres asked if she was staying in the apartment.  Mr. King stated that she does stay there, but was not there at that time.  Officer Torres asked if they could come in and make a quick search of the apartment.  Officer Torres testified that Mr. King responded "sure, come in," left the door open, turned around and began walking back into the apartment.  The three officers followed him inside.

Deputy Oro and Detective Sutphin testified to this conversation at the door and to defendant's consent for the officers to enter the apartment.  All the officers described the conversation as very friendly and that Mr. King was very polite, calm, and cooperative; there was no tension, threats, force, or coercion of any kind.

Detective Thorpe arrived on the scene and interviewed Deputies Torres and Oro for a search warrant.  The deputies' verbal statements were consistent with their suppression hearing testimony that Mr. King gave valid consent to enter the apartment. Deputy Torres' written report also reflects that Mr. King replied "sure, come in" when asked for permission to enter the apartment.

Deputy Oro's written sworn statement reflects the same, although it appears he simply copied that portion of Deputy Torres' report.

### (2)   Mr. King's Version

Mr. King testified that he heard a knock on his door, looked out the peep hole and could not see anyone.  Thinking it might be his neighbor, Mr. King opened the door and saw Deputy Torres.  The door opened outward, and Deputy Torres placed a hand on the door and, just as Mr. King was getting ready to push it open, Deputy Torres pulled it open the rest of the way.  In response to Deputy Torres' questions, Mr. King stated he knew of Ms. Blawat, but she did not stay there and was not in the apartment.  Mr. King testified that Deputy Torres asked if the officers could have permission to come in and search, and he said no.  Mr. King testified that Deputy Torres then stated that his informant said Ms. Blawat was there and he was coming in anyway.  Deputy Torres then entered the apartment, stepping past Mr. King and heading toward his bedroom.

### (3)   Court's Resolution of the Evidence

The Court finds that defendant King gave the officers valid consent to enter his apartment, and credits the testimony of the officers where it conflicts with Mr. King's testimony.  The Court found the officers to be candid in their testimony and to have demeanors indicative of truthfulness.  Deputy Torres' testimony as to the events at the doorway and to Mr. King's statement that

the officers could come in and search was supported by both Deputy Oro and Detective Sutphin, the report and sworn statement prepared afterwards, and his oral interview by Detective Thorpe as she prepared the search warrant affidavit.  While Mr. King's testimony was not shaken on cross examination, he testified that he has about fifteen prior felony convictions and obviously has a significant interest in the outcome of the suppression hearing and the case.  The Court concludes that Mr. King told the officers they could come in and search his apartment for Ms. Blawat.

The Court also finds that the government has established by at least a preponderance of the evidence that Mr. King's consent was voluntary and not simply the product of a mere submission to a claim of lawful authority.  There is no testimony that the officers suggested to Mr. King in any way that they had a right to enter his apartment without his consent, or that they would do so.  Mr. King's testimony does not suggest that he merely submitted to a claim of authority, since he testified he denied the officer's request.  No factor supports a finding that the consent was anything but voluntary.  Everyone described the conversation at the doorway as low-key and polite, and the officers described defendant as cooperative.  The officers simply knocked, explained their reason for being there, asked for

permission to search for the fugitive, and, in the Court's view, were voluntarily given that permission by defendant.[1]

## C. Events In The Apartment

Testimony about what transpired once the officers entered the apartment is also the subject of conflict.

### (1)   Officers' Version

Deputy Torres testified that after Mr. King told the officers they could make a quick search, Mr. King walked back into his apartment towards a room at the end of a hallway on the right. Deputy Torres became a little concerned because Mr. King picked up his pace as he went through the hallway as the officers followed.  Mr. King entered a bedroom, followed by Deputies Torres and Oro.  Deputy Torres testified he saw Mr. King pick up what was variously described as a pair of shorts or a pair of pants. While looking at the officers, Mr. King placed the shorts/pants on the corner of a nightstand and on some stacked shoeboxes next

---

[1]The government argued that Mr. King made a post-arrest statement to Detective Thorpe admitting that he had consented to the officers' entry into his apartment.  The Court has listened to Government's Exhibit 5 several times.  Defendant may have said "right" in response to the detective's question, but the Court simply cannot be certain.  The Court therefore accepts Mr. King's testimony that he made no response to that question, and was exercising his Fifth Amendment right to remain silent to that question as the officer had advised was his right. In any event, defendant was asked a compound question, and if he said "right" it is not clear whether it was to acknowledge his consent to the officers' entry or to acknowledge that he knew Ms. Blawat was not in the house.

to the nightstand.   The shorts/pants fell from the nightstand, revealing a firearm, drug paraphernalia, cocaine, and marijuana. A tray of cut-up marijuana and some baggies with cocaine were also on the nightstand, and had not been covered by the shorts/pants. These were visible to Deputy Torres when he entered the bedroom. Because he observed the firearm, Deputy Torres asked Mr. King if he could go into the living room for officer safety purposes while the officers searched the residence.   Mr. King replied okay, and walked into the living room with Deputy Oro.

Deputy Oro testified he was by the entrance to the bedroom and saw Mr. King picking up some pants and placing them in different locations.   Deputy Oro does not believe Mr. King got as far as the nightstand.   Because Mr. King was reaching for things, he was asked to leave the bedroom, which he did.   Deputy Oro accompanied Mr. King to the living room, and did not see any of the items on or near the nightstand. Detective Sutphin did not enter the bedroom at the time.

**(2)   Mr. King's Version**

Mr. King testified that he walked around Deputy Torres and entered his bedroom first.   Mr. King testified that he picked up a pair of black jeans from a chair and placed them on the nightstand in such a manner that they could not fall and nothing on the top of the nightstand could be seen.   Mr. King did this to prevent the officers from seeing what was on the nightstand, which

he knew included a firearm.  Additionally, Mr. King was standing in front of the nightstand, which he believes prevented the officers from seeing items on the nightstand.  Mr. King further testified that he lifted his bed to show that no one was underneath, and Deputy Oro checked and cleared the closet.  Mr. King and both officers then left the bedroom and went into the living room.

After arriving in the living room, Deputy Torres went back into the bedroom by himself.  Mr. King heard some noise which he recognized as being made by the things on the nightstand as Deputy Torres removed the pants Mr. King had placed there.  Deputy Torres returned to the living room with the revolver in his hand.

Mr. King also testified that some of the items depicted in the government's photographs of the top of the nightstand had in fact been in the bottom drawer of his dresser, and the only thing which had been on top was the firearm.

Mr. King was handcuffed and placed into a patrol car.  While they were waiting for a search warrant, Deputy Torres came downstairs with Mr. King's safe, which had been under some clothes in his closet, and asked Mr. King for the combination.  Mr. King refused to give it, prompting Deputy Torres to say it did not matter because he would break it anyway.

**(3)  Court's Resolution of the Evidence**

The Court finds that Deputy Oro made a mistake when he testified that Mr. King did not get near the nightstand.  Both Deputy Torres and Mr. King testified that he did so, and both agreed that he put a pair of shorts/pants on the nightstand.  The Court credits the testimony of Deputy Torres where it conflicts with defendant's testimony as to the placement of the shorts/pants and the events thereafter, for reasons similar to those set forth above.  The Court finds that Deputy Torres was able to see a portion of the drugs and paraphernalia on the nightstand even before the shorts/pants fell, and that the shorts/pants fell exposing other items including the firearm.  The Court finds no violation of defendant's constitutional rights when he was asked to return to the living room for officer safety.  Such a request was imminently reasonable given the presence of a firearm and the drugs.  The Court further finds that all the items on the nightstand and stacked shoeboxes were in Officer Torres' plain view, and could have been seized pursuant to the plain view doctrine.  Horton v. California, 496 U.S. 128, 136-37 (1990).  Deputy Torres testified that he was familiar with what both cocaine and marijuana looked like from his law enforcement experience, and therefore had probable cause to believe it was contraband.  Minnesota v. Dickenson, 508 U.S. 366, 375-76 (1993).  Given the Court's resolution of the other issues raised in the

motion, the search warrant was valid and also provided a proper basis to seize the items.

Accordingly, it is hereby

**ORDERED:**

Defendant's Motion to Suppress (Doc. #43) is **DENIED.**

**DONE and ORDERED** at Fort Myers, Florida, this __22nd__ day of February, 2016.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record